## IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

JAMES DEMPSEY             *
10729 Hillingdon Rd.        *
Woodstock, MD  21163     *

      *
     *Plaintiff*          *

      *
v.                          *    Case No.

      *
WELLS FARGO BANK, N.A.    *
SERVE ON:              *
CSC--Lawyers Incorporating Service    *
Company, Resident Agent      *
7 St. Paul Street, Suite 1660      *

      *
And                    *

      *
BANK OF AMERICA, N.A.     *
SERVE ON:              *
The Corporation Trust Incorporated,    *
Resident Agent           *
351 West Camden Street      *
Baltimore, MD 21201       *

      *
     *Defendants*       *

      *

2013 MAR 26  P 1:30

### COMPLAINT
### &
### REQUEST FOR JURY TRIAL

     Plaintiff James Dempsey through his attorney Phillip R. Robinson and the Legg Law Firm,

LLC hereby brings this Complaint and Request for Jury Trial against Defendants Wells Fargo Bank,

N.A. ("Wells Fargo") and Bank of America, N.A. ("BOA") and in support thereof states:

### I. INTRODUCTION

     1.     The claims outlined herein exemplify the predatory and deceptive and debt collection

practices that have rocked our headlines and economy for the past several years by certain so-called

professionals who have thumbed their nose to the rule of law and in which the Plaintiff, James Dempsey ("Plaintiff" or "Mr. Dempsey") has and continues to suffer damages and losses which have been directly and proximately caused by the Defendants' unsafe and unsound lending practices related to the servicing of Plaintiff's loan.

2.    The practices and pattern of material omissions, misstatements, misrepresentations, false statements, and other unfair and deceptive practices described herein by the Defendants, directly and indirectly, are the real-life examples of the same which have been subject to multiple national settlements by the Defendants with federal and state authorities.

3.    These claims concern the utter failure of Wells Fargo and BOA to follow Maryland law related to Mr. Dempsey's reasonable and appropriate requests to modify his mortgage loan subject to this action without seeking additional credit. In addition Defendants have failed to comply with their duties under Maryland law governing safe and sound banking practices.

4.    Many, but not all, Maryland homeowners facing foreclosure have reasonable and sustainable solutions to their mortgage situation. Mr. Dempsey does have a sustainable solution, yet the Defendants by and through their authorized agents and employees, are threatening a wrongful foreclosure—otherwise known as an adverse action—on Mr. Dempsey's home and property without having acted in good faith and having materially failed to properly service Mr. Dempsey's loan to his detriment.

5.    Further, and very significant Mr. Dempsey, because of the botched loss mitigation services provided by the Defendants, Mr. Dempsey has suffered and continues to suffer direct and proximate damages resulting from the unresolved mortgage situation in the form of legal fees, and undue stress and emotional damages for which Mr. Dempsey and his wife have sought counseling.

6.      If the threatened foreclosure sale of Mr. Dempsey's home and property proceeds, he will sustain significantly greater economic damages and losses as a result of loss of his home and further emotional damages as a result of those proceedings and the Defendants' actions which simply constitute and exemplify unsafe and unsound banking practices.

## II. PARTIES

7.      Mr. Dempsey is a resident of the State of Maryland and the owners of the real property commonly known as 10729 Hillingdon Road, Woodstock, Maryland ("the Property").

8.      Wells Fargo is the servicer of the residential mortgage loan subject to this action.

9.      Bank of America has retained Wells Fargo to act on its behalf in all actions described herein in this Complaint and as such it is liable for the acts of its authorized agent. BOA also claims to be the owner of the residential mortgage loan subject to this action.

## III. JURISDICTION & VENUE

10.     This Court has jurisdiction asserted because Defendants transact business and perform work and services in Maryland and have availed themselves of the jurisdiction of this Court through pursuit of foreclosure actions in this Court.

11.     Declaratory and injunctive relief are available pursuant to Md. Code Ann., §§ 3-401-3-415.

12.     Venue is appropriate in this Court because the Defendants conduct business within the city of Baltimore, Maryland.

## IV. FACTS

**A.     The Foreclosure Crisis**

15.     Over the last five years, Maryland and, indeed, the United States have been in a foreclosure crisis. Recent news reports have established that one in ten American homes is at risk of foreclosure.

16.     The number of Maryland properties with foreclosure filings has increased substantially throughout the last four years.

17.     Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the homes surrounding a foreclosure and, perhaps, neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

18.     The foreclosure crisis is far from over. Economists predict that interest rate resets on the riskiest of lending products have not reached their zenith. *See* Eric Tymoigne, Securitization, Deregulation, Economic Stability, and Financial Crisis, Working Paper No. 573.2 at 9, Figure 30 *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1458413 (citing a Credit Suisse study showing monthly mortgage rate resets).

**B.     Maryland's Response to the Foreclosure Crisis**

19.     In 2007 at the beginning of the crisis, Governor O'Malley convened a task force of representatives to address the crisis that was then underway. The Maryland Homeownership Preservation Task Force produced a report which aptly summarized the devastating effect of foreclosures on the community as follows:

> Foreclosures have a devastating effect on homeowners and the communities in which they live. Frequently, a homeowner who loses his or her home to foreclosure loses the accrued equity. A property sold in a foreclosure sale typically draws a lower price than it would in a regular market sale. In the first half of 2005, Maryland's "foreclosure discount" was 18.8 percent, according the St. Ambrose Housing Aid Center, Inc. This is a tragedy for a growing number of Maryland families.

Extensive damage is felt in neighborhoods and communities across Maryland. Research shows that with every foreclosure on a single family home, the value of homes within an eighth of a mile declines by about nine-tenths of a percent. Property tax revenues decline proportionally, causing a negative impact on state and local governments. A study of foreclosures in Chicago in 2005 estimated that a single foreclosure costs city government up to $5,000 or more.

Foreclosures also bring with them the potential for more violent crime. Research indicates that for every single percentage point increase in the foreclosure rate in a neighborhood, violent crime in that neighborhood increases by about two percent. Foreclosures can lead to vacant or neglected properties, which create an eyesore and become targets for vandalism. This can tip a community from one dominated by homeowners to one dominated by investors.

Of course, the lending industry and investors also take a hit from rising foreclosure rates. Some major lenders have closed their doors, declared bankruptcy or shuttered their subprime lending arms as a result of the waning demand for risky mortgage products in investor markets. Lenders typically lose $50,000 or more on a single foreclosure, according to information from St. Ambrose Housing Aid Center, Inc. The banking industry cites a figure well over $60,000.

Maryland Homeownership Preservation Task Force Report at 12 (November 29, 2007) *available at* http://www.gov.state.md.us/documents/HomePreservationReport.pdf (footnotes omitted).

20.     To reasonably address and avoid some of the negative consequences of foreclosure, the Task Force Report made nine general recommendations that are relevant to the issues before the Court. *See Id.* at 40-43.

21.     In response to the expanding foreclosure crisis and the Task Force Report, the General Assembly introduced and passed several bills during the 2008 legislative session to change Maryland's foreclosure process and curb certain predatory real estate processes. These bills were passed with nearly complete bi-partisan support. As summarized in the General Assembly's 90 Day Report for the 2008 session:

Until [2008], Maryland's foreclosure process, from the first foreclosure filing to final sale, had been among the shortest in the nation. Maryland is a quasi-judicial State, meaning that the authority for a foreclosure sale is derived from the mortgage or deed of trust, but a court has oversight over the foreclosure sale process. Most mortgages

or deeds of trust include a "power of sale" (a provision authorizing a foreclosure sale of the property after a default) or an "assent to decree" (a provision declaring an assent to the entry of an order for a foreclosure sale after a default). Under the Maryland Rules, it was not necessary to serve process or hold a hearing prior to a foreclosure sale pursuant to a power of sale or an assent to a decree. Consumer advocates contended that the short timeframes and weak notice provisions in State law seriously limited a homeowner's options to avoid foreclosure by, for example, working out a payment plan with the lender or selling the house. In addition, filing a request for an injunction to stop the sale is expensive, time consuming, and not a realistic option for most homeowners.

*Senate Bill 216 (Ch. 1)/House Bill 365 (Ch. 2),* emergency legislation that took effect April 4, 2008, make a number of significant changes to the foreclosure process in Maryland for residential real property. "Residential property" is defined under the Acts to mean real property improved by four or fewer single-family dwelling units. Except under specified circumstances, the Acts prohibit the filing of an action to foreclose a mortgage or deed of trust on residential property until the later of 90 days after a default in a condition on which the mortgage or deed of trust states that a sale may be made or 45 days after the notice of intent to foreclose required under the Acts is sent.

*Senate Bill 217/House Bill 360* define "mortgage fraud" as any action by a person made with the intent to defraud that involves:

- knowingly making, using, or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that it will be relied upon by a mortgage lender, borrower, or any other party to the lending process;
- receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from the aforementioned actions;
- conspiring to violate either of the preceding provisions; or
- filing or causing to be filed in the land records in the county where a residential real property is located any document relating to a mortgage loan that the person knows to contain a deliberate misstatement, misrepresentation, or omission.

Under the Acts, the "mortgage lending process" includes the solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and funding of a mortgage loan, as well as the notarizing of any document in connection with a mortgage loan.

Md. Dept. of Legislative Services, The 90 Day Report, A Review of the 2008 Legislative Session, F16-18 (April 11, 2008).

22.     The Maryland Court of Appeals recently adopted in October 2010 an emergency rule to deal with the robo-signing issue based upon the recommendation of the Standing Committee on Rules of Practice and Procedure.   Writing for the Committee the Honorable Alan M. Wilner explained:

> The need for these changes emanates from recent revelations regarding the filing in residential foreclosure actions of affidavits as to which the affiant either did not have sufficient knowledge of the facts stated in the affidavit to validly attest to their accuracy or did not actually read or personally sign the affidavit. Preliminary audits have shown that hundreds of such affidavits have been filed in Maryland circuit courts. Up to this point, courts, with good reason and really of necessity, have relied on the accuracy of affidavits, especially when filed by attorneys, unless there is something on the face of the document to suggest otherwise or the validity of the affidavit is challenged. Evidence that has recently come to light, largely through admissions under oath by the affiants themselves, has shaken the confidence that the courts have traditionally given to those kinds of affidavits.
> In the Committee's view, the use of bogus affidavits to support actions to foreclose liens on property, apart from prejudice to the homeowners, constitutes an assault on the integrity of the judicial process itself.

Letter from A. Wilner to the Court of Appeals, Oct. 15, 2010.

23.     In further response to the foreclosure crisis, Maryland Commissioner of Financial Regulation required for its licensees "a duty of good faith and fair dealing in communications, transactions, and course of dealings with a borrower in connection with the...servicing...of any mortgage loan, including, but not limited to...(3) The duty when servicing mortgage loans to: (a) Promptly provide borrowers with an accurate accounting of the debt owed when borrowers request an accounting; (b) Make borrowers in default aware of loss mitigation options and services offered by the licensee; (c) Provide trained personnel and telephone facilities sufficient to promptly answer and respond to borrower inquiries regarding their mortgage loans; and (d) Pursue loss mitigation when possible."   Md. Code Regs. 09.03.06.20.

**C.     Facts Related to Mr. Dempsey's Loan**

24.     On April 14, 2006, Mr. Dempsey executed a Deed of Trust with Wells Fargo related to his home which he had acquired a few years before as a new construction home.

25.     In late 2008 and early 2009, Mr. Dempsey experienced a significant reduction in income in his business as a realtor due to the severe downturn in the real estate market. Mr. Dempsey also had increased expenses at this time due to the arrival of his first child. Due to the reduction in income and increase in expenses, Mr. Dempsey fell behind in his mortgage payments.

26.     Also during early 2009, Mr. Dempsey filed for Chapter 7 bankruptcy, which was discharged in July, 2009. During the pendency of his bankruptcy proceedings, he successfully short-sold two investment properties he held. Mr. Dempsey reached out to Wells Fargo to request a repayment plan on the loan subject to these proceedings which was for his home and property due to the temporary reduction of income.

27.     Mr. Dempsey received a letter from Wells Fargo dated September 22, 2009 stating that he might qualify for the Home Affordable Modification Program ("HAMP"). The letter stated that Mr. Dempsey had to call Wells Fargo by October 6, 2009 to accept the offer of review for HAMP. Mr. Dempsey called Wells Fargo on October 1, 2009, and was told what documents he needed to provide to be considered for HAMP. The representative, named Jennifer, also told Mr. Dempsey that his review period would take 90-120 days, i.e., within the 30 days following completion of his trial period plan. In reliance on these representations, Mr. Dempsey provided all requested documents in a timely manner.

28.     Later, Mr. Dempsey received a letter dated October 2, 2009 stating that he had successfully entered the trial period payment plan for HAMP, and stating what documents he would need to provide to be considered for a final HAMP modification, which were the same documents he had already provided. However, to be thorough, Mr. Dempsey provided all requested documents in a

timely manner again. The letter also stated that his trial period payments of $1,240.00 were due for the months of November, 2009 to January, 2010.

29.     After his trial period plan had run, Mr. Dempsey received a letter from Wells Fargo dated January 12, 2010 stating that he needed to provide the same documents he had previously submitted in October, 2009 by February 11, 2010 in order to be considered for a final HAMP modification. Mr. Dempsey submitted all requested documents on January 20, 2010, the same day he received the letter. Mr. Dempsey also called Wells Fargo on January 20, 2010 and confirmed with the representative which documents were required and set up a payment for February 1, 2010 of $1240.00.

30.     In early February 2010 Mr. Dempsey called Wells Fargo and spoke with a representative named Andre, who informed Mr. Dempsey that he was Mr. Dempsey's single point of contact and informed Mr. Dempsey that he needed to submit additional documentation for his modification request. Mr. Dempsey submitted the requested documentation on February 23, 2010.

31.     Mr. Dempsey called again on February 26, 2010 and set up payments for March, April and May of 2010 at the same rate as his trial period plan, $1240.00.

32.     On April 13, 2010 Mr. Dempsey called Wells Fargo and was told that he needed to submit additional documents for his modification request. He faxed all requested documents that day, except for a letter he needed to get from his accountant, which he faxed in the next day, April 14, 2010.

33.     On April 19, 2010 Mr. Dempsey called Wells Fargo again, and spoke with his single point of contact Andre, who informed Mr. Dempsey that all required documents had been received and that his file had been assigned to someone else who he would hear from within a week.

34.     After not hearing from anyone, Mr. Dempsey called Wells Fargo again on May 17,

2010 and was informed that his file was still in review, that the new negotiator assigned to the file was Terry Genevive, and that additional documents were needed. Mr. Dempsey set up his payment for June 1st of $1,240.00 as well. Mr. Dempsey submitted all requested documents by fax on May 19, 2010.

35.    Mr. Dempsey called Wells Fargo again on June 16, 2010 to check for updates. He spoke with a representative by the name of Michelle (ID# H6C), who informed Mr. Dempsey that Wells Fargo had all requested documents and that his file had been assigned to someone else. However, in a good faith attempt to ensure that nothing was out of date, Mr. Dempsey faxed in updated docs on June 23, 2010.

36.    On July 14, 2010 Mr. Dempsey called Wells Fargo again to receive updates on the review of his file. During this call he set up his payment for August 1, 2010 of $1240.00.

37.    In mid July, 2010, Mr. Dempsey received a Notice of Intent to Foreclose ("NOI") from Wells Fargo dated July 11, 2010. At this point Mr. Dempsey became very concerned about the review status of his modification request, since he was told originally that the entire review process would take only 30 days from the receipt of his final trial period plan payment, and yet he had made timely payments for nine months, but foreclosure proceedings were beginning on his property nonetheless.

38.    On August 2, 2010 Mr. Dempsey called Wells Fargo to express his concerns about the NOI and the review process for his modification request. He spoke with a representative named Jessica who told Mr. Dempsey that Wells Fargo had all of the requested documents, that the documents were with his processor Terry Genevive, and to disregard the Notice of Intent to Foreclose because Wells Fargo could not foreclose if payments were still being made and the file was still in review. Jessica said continue making the trial period payments of $1,240 a month and

told him that Terry Genevive would contact him. However, Mr. Dempsey was still concerned that nothing was being done with his file, and requested additional information that Jessica was unable to provide. Jessica put Mr. Dempsey on hold and conferred with her supervisor. When Jessica returned to the line, she told Mr. Dempsey that his file had been resent to Gene Underwood and the supervisor, and to call back on Monday if he had not heard from anyone in 3 days.

39.    Mr. Dempsey called back on August 9, 2010 and spoke with a representative named Bille Jo (ID# SR1), who requested additional documents to complete his review. In reliance on these representations, Mr. Dempsey faxed in the additional requested information on August 17, 2010. During this telephone call, Mr. Dempsey also set up payments with Billie Jo for September and October, 2010 ($1,240 monthly).

40.    On August 25, 2010 Mr. Dempsey called Wells Fargo to confirm nothing further was needed and to check for an update to the file. He was told that all documents were in and nothing further was required.

41.    On or about August 27, 2010 Mr. Dempsey called Wells Fargo again and asked to speak with Mr. Genevive, and was told that "Terry Genevive" is a pseudonym that Wells Fargo assigns to files that do not yet have processors assigned.

42.    Wells Fargo sent Mr. Dempsey a letter dated September 1, 2010 stating that it was unable to adjust the terms of his mortgage and falsely stating that he had been removed from consideration under the HAMP program because he had failed to submit required documents as requested.

43.    Mr. Dempsey was confused and distressed by the letter of September 1, 2010 and called Wells Fargo on September 14, 2010 at 12:30 p.m. to find out how he could have been removed from consideration for failure to submit documents when he had been told on August 25,

2010 that he had submitted all required information. During this telephone call, Mr. Dempsey spoke with a representative named Rinku (ID# SF9), who reviewed Mr. Dempsey's file and agreed that everything requested had been timely submitted and nothing further was needed. Rinku stated that Wells Fargo made a mistake by removing him and stated that she was going to make a request to have him re-instated into the HAMP program.

44.     Despite Rinku's representations, Mr. Dempsey was still concerned and distressed at the contradictory information he had received from Wells Fargo and requested to speak with Rinku's supervisor. Rinku connected Mr. Dempsey to the team leader, Ed (ID# 6TR), who reviewed Mr. Dempsey's file and confirmed that the error was on Wells Fargo's end and that Mr. Dempsey had done everything requested. Ed also stated that he could see that Mr. Dempsey always sent in documents promptly after they were requested and that he would create a work order for Loss Mitigation to re-instate Mr. Dempsey into HAMP. Ed told Mr. Dempsey to call back that Friday, September 17, 2010 to verify that he was reinstated.

45.     Mr. Dempsey called on Friday September 17, 2010 as directed and spoke with a representative by the name of Aneeah (ID# ICT), who informed Mr. Dempsey that additional documents were required and that the work order submitted on September 14, 2010 by Ed had been denied. Aneeah transferred Mr. Dempsey to a supervisor named Sabrina, where he got her voicemail and left a message.

46.     Not satisfied with the follow up call, Mr. Dempsey immediately called Wells Fargo again and spoke with a representative named Mildred (ID# NAB), who informed Mr. Dempsey that he had in fact been removed from consideration for a HAMP modification in error and that he was never assigned a processor. Mildred explained to Mr. Dempsey that since he was removed from HAMP he would have to try an in-house modification, but that she would see what could be done to

get him re-instated into HAMP. Mildred also had Mr. Dempsey set up his October, 2010 payment in the amount of $2,186.49, because he was no longer in the HAMP trial period so his payments had reverted back to his contractual monthly mortgage payment amount. Mildred also requested that Mr. Dempsey send in updated documents to restart the HAMP consideration process.

47.     In reliance on these representations, Mr. Dempsey faxed all requested documents to Wells Fargo on September 23, 2010.

48.     In early October, 2010 Mr. Dempsey called Wells Fargo to check on the status of his modification review. He was informed that his new Home Preservation Specialist ("HPS") was Victoria Dixon, who had been assigned to his file on September 17, 2010. Mr. Dempsey was also informed that he needed to submit additional documents for consideration. In reliance on these representations, Mr. Dempsey timely faxed in the requested documents on October 13, 2010.

49.     On October 18, 2010 Mr. Dempsey called Wells Fargo again and was informed by a representative named Deidre (ID# WF359) that everything had been received and nothing further was needed.

50.     Notwithstanding Deidre's representations, on November 11, 2010 at 4:00 p.m., Mr. Dempsey received a phone call from a Wells Fargo representative who stated that additional documentation was required and that it had to be submitted within 24 hours.

51.     In reliance on these representations, Mr. Dempsey faxed over the additional requested documents the following day, November 12, 2010 during the early afternoon.

52.     Notwithstanding his timely submission of documents, on November 15, 2010 Mr. Dempsey received a letter dated on November 12, 2010 which stated he had been removed from the trial modification for not providing information needed within the timeframe required and for that reason would not be approved for a mortgage loan modification.

53.    The same day Mr. Dempsey received the letter, November 15, 2010, he called Wells Fargo to demand an explanation, since he had in fact submitted the requested documents on time. During this call, he spoke with a representative named Lakeithia (ID# MYJ). Lakeithia informed Mr. Dempsey that he should be re-instated into the modification review since he had been removed before the 24 hours were up, and despite submitting all requested documents within that timeframe. Lakeithia also advised Mr. Dempsey to call back that Friday, November 19, 2010.

54.    On November 19, 2010, Mr. Dempsey received a call from a Wells Fargo representative named Savannah who requested additional documents.  Savannah informed Mr. Dempsey they he was re-instated into the loan modification trial plan on November 16, 2010.

55.    In reliance on these representations, Mr. Dempsey faxed in the additional docs requested on November 22, 2010.

56.    Mr. Dempsey called Wells Fargo on Tuesday November 23, 2010 and spoke with a representative named Dawn (ID# NZJ) who informed Mr. Dempsey that everything requested had been received, that they did not need anything further, and that his new processor was Steven Porter.

57.    Mr. Dempsey called Wells Fargo on Saturday December 10, 2010 for a status update. He spoke with a representative named Josh (ID# KQ9) who informed Mr. Dempsey that he had been assigned a new processor named Daniel Taylor on December 10, 2010.

58.    On Thursday December 16, 2010 Mr. Dempsey spoke with a senior representative named Eric (ID# RDH) who informed Mr. Dempsey that Wells Fargo should be able to have him re-instated into the HAMP program.  After reviewing the file and notes, Eric also informed Mr. Dempsey that he was fairly certain that an internal problem had held up his file. Mr. Dempsey set up his January payment with Eric for the amount of $2,186.49, in addition to a $20 over the phone fee which Mr. Dempsey had never been asked to pay before.

59.     On December 21, 2010 at 9:20 p.m., Mr. Dempsey received a phone call from a Wells Fargo representative who informed him that additional documents were required and needed to be submitted within 24 hours. The following day, December 22, 2010, Mr. Dempsey faxed in the requested documents. Mr. Dempsey called Wells Fargo on December 23, 2010 to confirm everything had been received and that nothing further was needed. The representative confirmed everything had been received but nonetheless informed Mr. Dempsey that he had been removed from loan modification review on December 22, 2010. The representative told Mr. Dempsey that he was emailing his processor, Daniel Taylor, to advise him that everything was received on time. Mr. Dempsey also spoke with a senior representative by the name of Carla (ID# STO) who informed him that she was going to open up a work order to find out what was going on with his file.

60.     On January 3, 2011, Mr. Dempsey received a call from Cory in Wells Fargo's Mortgage Servicing Department. Cory asked Mr. Dempsey if he wanted to keep his house or sell it, as he was still not re-instated into the modification. After Mr. Dempsey related the multiple mistakes made by Wells Fargo in reviewing his modification request and explained how he had submitted all requested documents in a timely fashion, and how Carla had put in a work order to determine why Mr. Dempsey's modification requests had been denied, Cory stated to Mr. Dempsey that the call was made in error and ended the conversation.

61.     On January 6, 2011 Mr. Dempsey called Wells Fargo and spoke with a representative named Karen (ID# IOW) who informed him that he had been re-instated on January 5, 2010 into an in-house loan modification. Karen also stated that Mr. Dempsey had a better chance of receiving an in-house modification than a HAMP modification because the investor on his mortgage was Bank of America and Karen did not think that Bank of America would approve a loan modification through HAMP.

62.     On January 10, 2011 Mr. Dempsey spoke with a Wells Fargo representative who advised him that additional documents were required for review and stated that the documents needed to be submitted by January 15, 2010. In reliance on these representations, Mr. Dempsey faxed the requested documents to Wells Fargo on January 11, 2011.

63.     On January 12, 2011 at 8:40 p.m. Mr. Dempsey spoke to a representative who informed him that some revisions needed to be made the fax he sent the previous day. In reliance on these representations, Mr. Dempsey made those revisions and faxed the corrected documents to Wells Fargo on January 12, 2011.

64.     On January 19, 2011, Mr. Dempsey received a telephone call from his new processor Marietta White. Ms. White informed Mr. Dempsey that Wells Fargo was offering him a Special Forbearance Agreement that he would have to sign and that he would have to set up three payments. On January 25, 2011 Mr. Dempsey faxed the signed Special Forbearance Agreement and set up the three payments over the telephone with a representative named Ms. Vernetta (ID# 609). Mr. Dempsey was told to contact Wells Fargo on May 1, 2011 to provide additional documents once the three payments were completed.

65.     In reliance on these representations, Mr. Dempsey faxed all requested information to Wells Fargo on May 1, 2011.

66.     On May 6, 2011 Mr. Dempsey spoke with a Wells Fargo representative who informed him that additional documents were needed. In reliance on these representations, Mr. Dempsey faxed all requested information to Wells Fargo on May 9, 2011.

67.     Mr. Dempsey called Wells Fargo on May 17, 2010 checking in for an update and spoke with a representative named Chris (ID# 9NK) who informed him that Ms. Toni Jackson was assigned his file as processor on May 7, 2011.

68.     On May 31, 2011 at 6:45 p.m. Mr. Dempsey called Ms. Jackson, who informed him

that additional documents were required to complete his review. In reliance on these representations,

Mr. Dempsey faxed the requested documents to Wells Fargo on June 2, 2011.

69.     On June 2, 2011 Toni Jackson called Mr. Dempsey and advised him that she had

received everything that was required of him and that she did not need anything further to complete

her review. Ms. Jackson stated that she was submitting Mr. Dempsey's file to underwriting who

would work with the investor (Bank of America) to decide whether to offer Mr. Dempsey a

modification. Ms. Jackson further advised Mr. Dempsey that the review process would take

approximately 30 days and that she would contact Mr. Dempsey with any updates or if Wells Fargo

needed anything further.

70.     Wells Fargo sent Mr. Dempsey a letter dated July 7, 2011 stating that Toni Baldwin

was his new HPS.

71.     Notwithstanding Ms. Jackson's prior representations that Mr. Dempsey's review

process would be completed 30 days from June 2, 2011, on August 12, 2011 Mr. Dempsey spoke to a

representative named DeDe (ID# OK1), who informed him that additional documents were needed to

complete review. DeDe also advised Mr. Dempsey not to set up September's payment yet, as a final

decision was going to be made on his modification request very soon.

72.     After not hearing back from Wells Fargo for three weeks, Mr. Dempsey called on

September 1, 2011 at 11:20 a.m. and spoke with a representative named Nicole (ID# WPW). Nicole

informed Mr. Dempsey that his processor had just sent the updated documents he had submitted to

the underwriter 5 days ago prior (August 25, 2011).Nicole further advised that Mr. Dempsey did not

need to send in any further documents and that there should be a final decision in September and if

not that he should call back on October 1, 2011 to make a payment.

73.    On September 26, 2011 at 1:05 p.m. Mr. Dempsey called Wells Fargo for an update. He spoke to a representative who informed him that additional documents were needed once again, and who falsely stated that such documents were requested of Mr. Dempsey on Sept. 14, 2011. Mr. Dempsey had called the week before and was told nothing further was needed. Mr. Dempsey set up October's payment with the representative and was told that a final decision should be made regarding his modification process within 30 days. In reliance on these representations, Mr. Dempsey faxed in all of the requested documents that day, September 26, 2011.

74.    On November 22, 2011 Mr. Dempsey called Wells Fargo to get an update. The representative he spoke with informed him that he needed to submit additional documents for review, and that the documents had to be received by November 29, 2011. In reliance on these representations, Mr. Dempsey faxed in all of the requested docs on November 29, 2011.

75.    On Wednesday November 30, 2011 at 10:10 a.m. Mr. Dempsey called Wells Fargo for an update. He spoke to a representative named Anita, whom informed him that all required documents had been received and nothing further was needed and that the underwriter should have a final decision in 30-45 days. Mr. Dempsey also set up December's payment with Anita.

76.    On January 10, 2012, Wells Fargo assigned its beneficial interest under the Deed of Trust on the property to Bank of America, but retained servicing responsibility on the loan.

77.    Trying to be proactive and responsible in assisting Wells Fargo with his loan modification review process, Mr. Dempsey faxed updated documents on January 25 and 26, 2012.

78.    Trying to be proactive and responsible in assisting Wells Fargo with his loan modification review process, Mr. Dempsey faxed updated documents on February 9 and 20, 2012

79.    Trying to be proactive and responsible in assisting Wells Fargo with his loan modification review process, Mr. Dempsey faxed updated documents on March 5, 2012. Along with

this fax transmission, Mr. Dempsey explicitly asked what (if any) decision the underwriter had reached regarding his modification, as the time periods expressed to him had proven false. He received no response.

80.     Trying to be proactive and responsible in assisting Wells Fargo with his loan modification review process, Mr. Dempsey faxed updated documents on April 2, 2012. Along with this fax transmission, Mr. Dempsey again explicitly asked what (if any) decision the underwriter had reached regarding his modification, as the time periods expressed to him had proven false. He received no response.

81.     Mr. Dempsey sent Wells Fargo a fax again on April 23, 2012 explicitly asking what (if any) decision the underwriter had reached regarding his modification, as the time periods expressed to him had proven false.

82.     On April 25, 2012 Mr. Dempsey received a letter from Wells Fargo advising him that Jamie Wyatt had been assigned as Mr. Dempsey's new HPS.

83.     On May 9, 2012 Mr. Dempsey called Wells Fargo for an update and spoke with a representative named Charlya (ID# 249) and then his HPS Jamie Wyatt. Mr. Dempsey was informed that additional documents were required to complete review of his modification application. Mr. Wyatt also advised that the underwriter reviewing Mr. Dempsey's file for Bank of America was Quinton Freeman. In reliance on these representations, Mr. Dempsey faxed in the requested information on May 10, 2011.

84.     After not hearing back from Wells Fargo for over a month, Mr. Dempsey called on July 25, 2012 for an update and to set up his August payment. The representative he spoke with advised Mr. Dempsey that he had been placed into active foreclosure as of that day, and thus could not set up a payment.

85.    On July 26, 2012 Mr. Dempsey had a conference call between his HPS, Mr. Wyatt

and the underwriter, Quinton Freeman. During this call Mr. Freeman asked a number of questions

and expressed confusion about items such as Mr. Dempsey's tax returns and Profit/Loss Statements.

Mr. Freeman requested that Mr. Dempsey to provide a substantial amount of additional information,

much of which was already provided, and asked Mr. Dempsey to change the format of his monthly

Profit/Loss statements to show his income broken up by the different companies he earns income

from and not as a total individual net income.  After Mr. Freeman left the call Mr. Dempsey spoke

individually with Mr. Wyatt who stated that he was confused by Mr. Freeman's requests and had

been going back and forth with Mr. Freeman for quite some time in regards many different items in

Mr. Dempsey's file.  Mr. Wyatt also represented to Mr. Dempsey in this call (and sever others) that

he believed Mr. Dempsey would qualify for a loan modification because in Mr. Wyatt's experience

he had seen borrowers who were much further behind than Mr. Dempsey receive loan modifications.

86.    In reliance on the representations made in the July 26, 2012 conference call, Mr.

Dempsey faxed in the documents requested by Mr. Freeman on August 2 and August 10, 2012.

87.    In an abrupt change of tune, Wells Fargo sent Mr. Dempsey a letter dated August 29,

2012 advising him that he was denied a loan modification this time because he makes too much

income. The same letter offered Mr. Dempsey another Temporary Forbearance Agreement which

would raise his monthly mortgage payment from $1240.00 to $3,574.89 over the next 12 months

with the first payment scheduled for October 1, 2012. This payment amount was too high for Mr.

Dempsey to make consistently, and was in fact over a thousand dollars higher than his original

contractual mortgage amount of $2186.49.

88.    Mr. Dempsey was concerned that the payment amount under the Temporary

Forbearance Agreement was unsustainable for him since his income fluctuated from month to month

due to his self-employment. When he expressed these concerns to Mr. Wyatt on the telephone in September, 2012, Mr. Wyatt told him that Mr. Freeman had advised that this was the only option available to Mr. Dempsey.

89.    In reliance on the representation that the Temporary Forbearance Agreement was his only option to keep his home, Mr. Dempsey set up his first payment for October 1, 2012 on September 27, 2012 with a representative named Carl (ID# Y9Q).

90.    Mr. Dempsey received a letter dated October 4, 2012 from Wells Fargo stating that his new HPS is Keri Griese. Mr. Dempsey left numerous voicemails for Keri Griese in the month of October to see if there were options available to revise the payment to something more sustainable. He recieved no response.

91.    On Wednesday October 31, 2012, Mr. Dempsey called Wells Fargo to schedule his November payment in the amount of $3,574.89.

92.    In November, 2012 Mr. Dempsey finally was able to reach Ms. Griese and asked whether there was any possibility of revising his monthly payment to something more sustainable. Ms. Griese advised Mr. Dempsey that the only way his payment amount could be modified was if he failed to make the December payment under the Temporary Forbearance Agreement, which would result in the agreement being canceled within 30 days at which point she would need Mr. Dempsey to provide new updated info for Wells Fargo to review.  Mr. Dempsey did not set up payment for December and decided to start seeking legal counsel.

93.    Mr. Dempsey would not have entered into the HAMP program had he known what a convoluted and frustrating process it would be. When he was first approached about HAMP in September, 2009, he was almost caught up on his mortgage under the repayment plan that was put in place during the pendency of his bankruptcy proceedings. Being told that the review process for a

HAMP modification would take between 90-120 days and that such a modification could lower his payment, he decided to pursue such a modification. Mr. Dempsey's current delinquency amount on his mortgage is entirely due to Wells Fargo's failure to adhere to its representations to Mr. Dempsey regarding the timeline for review of a modification request and the lowered payment that Mr. Dempsey made over the course of the materially defective modification review process with Wells Fargo, which has taken over three years.

94.     The material misrepresentations, misstatements and omissions of Wells Fargo in relation to Mr. Dempsey's loan modification efforts have caused Mr. Dempsey extreme stress and anxiety as to the status of his home which has translated into marital problems leading to Mr. Dempsey's separation from his wife and payment of over $2500.00 for marriage counseling services and has also caused severe anxiety in his two young children, who are confused and upset over their parents separation and their father's unclear ability to preserve his home.

95.     The elongated review process caused by Wells Fargo's material misrepresentations, misstatements and omissions has also prevented Mr. Dempsey from repairing the credit damage caused by his bankruptcy from being erroneously placed into active foreclosure.

96.     The material misrepresentations, misstatements and omissions made by Wells Fargo on BOA's behalf have caused Mr. Dempsey missed business opportunities as he has had to take time away from his business so often to complete the multiple and redundant documents requests made by Wells Fargo and had to spend so much time on telephone calls following up with Wells Fargo when they have failed to communicate any information to him regarding his loan modification review process.

97.     Given Wells Fargo's repeated material misrepresentations, misstatements and omissions when dealing with Mr. Dempsey on BOA's behalf as BOA's authorized agent, Mr.

Dempsey has no other option but to seek the assistance of this Court to obtain relief and stability in his home.

## COUNT I- THE MARYLAND MORTGAGE FRAUD PROTECTION ACT

### (Against All Defendants)

98.    Plaintiff re-alleges the previous paragraphs as if fully restated herein.

99.    The Maryland Mortgage Fraud Protection Act, Md Code Ann., Real Prop. § 7-401, *et seq.* ("MMFPA") governs the relationship between the Defendants and Mr. Dempsey.

100.    The MMFPA defines a "homeowner" as a record owner of residential property. Md Code Ann., Real Prop. § 7-401 (c).

101.    Mr. Dempsey is the record owner of the Property and is therefore a homeowner under the Act.

102.    The MMFPA defines "mortgage lending process" to include the solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and funding of a mortgage loan. Md Code Ann., Real Prop. § 7-401 (e).

103.    Under the MMFPA, a "mortgage loan" means any loan or other extension of credit that is (1) secured, in whole or in part, by any interest in residential real property in Maryland, and (2) is primarily for personal, household, or family purposes. (As stated in Md Code Ann., Fin. Inst. § 11-501 (l)). The loan extended to Mr. Dempsey was primarily for his personal, household, and family use and was secured by an interest in the residential real property located at 10729 Hillingdon Road and is therefore a "mortgage loan" as defined by the MMFPA.

104.    The MMFPA defines "Mortgage fraud" (Md Code Ann., Real Prop. § 7-401 (d)) as any action by a person made with the intent to defraud that involves:

    a.    Knowingly making any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

    b.    Knowingly creating or producing a document for use during the mortgage lending process that contains a deliberate misstatement, misrepresentation, or omission with the intent that the document containing the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process; and

    c.    Knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

105.    Wells Fargo falsely represented to Mr. Dempsey on October 2, 2009 that he had been approved for a trial period payment plan under HAMP, which would last for three months, and within thirty days after that trial period was over, that he would be accepted or rejected for a final HAMP modification. (¶¶ 27, 28)

106.    Wells Fargo subsequently stated to Mr. Dempsey on numerous occasions that he had submitted all required information to evaluate him for a HAMP modification in a timely fashion, and Mr. Dempsey relied on these statements. (¶¶ 29, 33, 35, 38, 40, 43, 44, 49, 53, 56, 59, 69, 72, 73, 75).

107.    However, Wells Fargo also knowingly and falsely stated to Mr. Dempsey on numerous occasions that he was rejected from further consideration for a HAMP modification, or was placed in active foreclosure, because of a failure to provide requested information. (¶¶ 42, 52, 59, 60).

108.    Additionally, Wells Fargo informed Mr. Dempsey that he was unlikely to receive a modification under HAMP due to the guidelines of the investor on his mortgage, Bank of America,

whose investor guidelines Wells Fargo knew or should have known would preclude Mr. Dempsey from consideration under HAMP. (¶ 60).

109.   Notwithstanding this knowledge, Wells Fargo sent repeated demands for information, representing that these demands were to obtain information with which Mr. Dempsey would be evaluated for a mortgage loan modification. These representations were knowing and deliberate misstatements, misrepresentations and omissions within the meaning of § 7- 401 (d).

110.   BOA is also liable for the wrongful actions of Wells Fargo acting on its behalf as its authorized agent.

111.   Defendants Wells Fargo and BOA have committed Mortgage Fraud by engaging in acts as described above.

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendants Wells Fargo and BOA for:

a. Compensatory economic and non-economic damages in the amount of no less than $150,000

b. Treble damages in the amount of no less than $450,000 as authorized by Md Code Ann., Real Prop. § 7-406(c).

c. Plaintiffs costs and attorney's fees pursuant to Md Code Ann., Real Prop. § 7-406(b).

d. Such further relief as the Court deems just and proper.

## COUNT II: VIOLATION OF MARYLAND CONSUMER DEBT COLLECTION ACT

### (Against All Defendants)

112.   Plaintiff re-alleges the previous paragraphs as if fully restated herein.

113.     Wells Fargo's repetitive representations to Mr. Dempsey that he could obtain a modification to the loan under which he was indebted were attempts to collect a consumer debt, and were therefore governed by the Maryland Consumer Debt Collection Act, Md Code Ann., Comm. Law §§ 1-201 *et seq.* ("MCDCA").

114.     The MCDCA defines a "consumer transaction" as "any transaction involving a person seeking or acquiring real or personal property, services, money, or credit for personal, family, or household purposes." Md Code Ann., Comm. Law § 14-201(c).

115.     The servicing of Mr. Dempsey's mortgage loan was a consumer transaction under the MCDCA. Plaintiff used the mortgage loan for personal, family, and household purposes.

116.     The MCDCA defines a "collector" as "a person collecting or attempting to collect an alleged debt arising out of a consumer transaction." Md Code Ann., Comm. Law § 14-201(b).

117.     Under the MCDCA, a "person" may be a corporation or any other legal or commercial entity. Md Code Ann., Comm. Law § 14-201 (d). Wells Fargo is a person under the MCDCA.

118.     Wells Fargo's demands for information and the subsequent institution of foreclosure proceedings against Plaintiff were attempts to collect the debt that Plaintiff owed on his mortgage. Wells Fargo is therefore a "collector" as defined by the MCDCA.

119.     The MCDCA states that, in collecting or attempting to collect an alleged debt, a collector may not "claim, attempt, or threaten to enforce a right with knowledge that the right does not exist." MD Code Ann., Comm. Law §14- 202(8).

120.     Because Wells Fargo's own failures to consider timely complete document submissions in its review of Mr. Dempsey resulted in his placement into foreclosure, denial of a HAMP modification, and placement into the onerous temporary forbearance agreement, these

attempts by Wells Fargo to collect on Mr. Dempsey's mortgage debt were attempts to enforce a right that the Defendants knew did not exist within the meaning of §14-202(8) and thus violations of the MCDCA.

121.    Alternatively, because Wells Fargo knew in advance of its solicitations of Mr. Dempsey to pursue his HAMP modification that such modifications were not available according to Bank of America's purported limitations, these solicitations were attempts to enforce a right that the Defendants knew did not exist within the meaning of §14-202(8) and thus violations of the MCDCA.

122.    BOA is also liable for the wrongful actions of Wells Fargo acting on its behalf as its authorized agent.

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendants Wells Fargo and BOA for:

a. Compensatory economic and non-economic damages in the amount of no less than $150,000

b. Such further relief as the Court deems just and proper.

## COUNT III: VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT
### (Against All Defendants)

123.    Plaintiff re-alleges the previous paragraphs as if fully restated herein.

124.    The mortgage loan transactions and foreclosure practices as set forth herein of the Defendants against the Plaintiff are governed by the Consumer Protection Act, MD. CODE ANN. COM. LAW § 13-101 *et. seq.*

125.    Section 13-303 prohibits unfair or deceptive trade practices in the extension of consumer credit or collection of consumer debts. The consideration of a loan modification and threat

of a foreclosure action involves both the extension of credit and the collection of debts. Section 13-316 requires servicers like Wells Fargo to respond to inquiries from consumers within 15 days.

126.    The Maryland Consumer Protection Act defines unfair or deceptive trade practices to include, inter alia, the following: (a) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers; and (b) Failure to state a material fact if the failure deceives or tends to deceive.

127.    By engaging in the acts and omissions set forth above, by making the misrepresentations set forth above, and by failing to disclose material facts where the failure to do so deceived or tended to deceive, the Defendants have committed unlawful or deceptive trade practices in violation of the Maryland Consumer Protection Act. Sec. 13-301(1) and (3) and Sec. 13-303(4) ("MCPA").

128.    The Defendants' conduct, as set forth above, had the capacity, tendency or effect of deceiving Mr. Dempsey, who in fact was deceived and misled, causing injury and loss through the unfair or deceptive prosecution, based upon incomplete and bogus responses to his requests for modifications of his loan, or threat of prosecution of a foreclosure action by Defendants.

129.    Mr. Dempsey's damages as alleged herein were proximately caused by Wells Fargo's actions including damages for emotional distress and mental anguish suffered with or without accompanying physical injury as well as those damages described in ¶¶ 93, 94, 95 above.

130.    BOA is also liable for the wrongful actions of Wells Fargo acting on its behalf as its authorized agent.

131.    The Defendants' violations of the MCDCA are per se violations of the MCPA pursuant to § 13-301(14) (iii) of the Commercial Law Article.

WHEREFORE, Plaintiff respectfully request that judgment be entered against Defendants Wells Fargo and BOA for:

a. Compensatory economic and non-economic damages in the amount of no less than $150,000

b. Plaintiffs costs and attorney's fees pursuant to Md Code Ann., Comm. Law § 13-408(c).

c. Such further relief as the Court deems just and proper.


Respectfully submitted,


Phillip R. Robinson
Legg Law Firm, LLC
5500 Buckeystown Pike
Frederick, MD 21703
(301)620-1016
Attorney for Plaintiffs

## REQUEST FOR A JURY TRIAL

Plaintiff requests a jury trial on all claims asserted herein.

_____
Phillip Robinson